IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN F. ECK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 07 C 6695 |
| vs. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security | ) | Magistrate Judge Arlander Keys |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, John F. Eck, has filed a motion for Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, seeking to reverse or remand the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), who denied his claim for Disability Insurance Benefits ("DIB") (42 U.S.C. § 423 (West 2004)). Mr. Eck seeks retroactive and prospective benefits, as well as attorney's fees. In the alternative, Mr. Eck seeks an order remanding the case for another hearing. The Commissioner has filed a cross motion for summary judgment, seeking an order affirming his final determination. For the reasons set forth below, Mr. Eck's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

## PROCEDURAL HISTORY

On September 7, 2004, Mr. Eck filed an application for disability insurance benefits, alleging that he became disabled as of January 1, 1999. Record at 11. He alleged that he suffered from a variety of ailments, including diabetes, hypertension, hyperlipidemia, rotator cuff issues, and Parkinson's disease. Record at 107, 122-3, 214, 221.

Based on his earnings records and his medical records, Mr. Eck was awarded DIB as of February 11, 2004, for meeting § 11.06 of the Listings for Parkinson's, based on his earnings record and the medical record. Record at 11. On March 28, 2005, Mr. Eck filed a request for reconsideration, and, on August 8, 2005, the Agency upheld its determination upon reconsideration. Record at 16-17. On October 11, 2005, Mr Eck filed a timely written request for hearing before an Administrative Law Judge ("ALJ"). Record at 36. A hearing was held on March 22, 2007, before ALJ Janice M. Bruning in Oak Park, Illinois. Record at 5, 11. Glee Ann L. Kehr, a vocational expert, also appeared at the hearing but did not testify. *Id.*

Following the hearing, the ALJ issued a decision on April 24, 2007, finding that Mr. Eck was disabled as of February 11, 2004, under §§ 216(I) and 223(d) of the Social Security Act. Record at 15. Mr. Eck filed a request for review of the ALJ's

decision with the Social Security Administration's Appeals Council on June 22, 2007. Record at 7. On September 26, 2007, the Appeals council denied the request for review, making the ALJ's February 11, 2004 decision the final administrative decision of the Commissioner. Record at 2.

On November 30, 2007, Mr. Eck filed a complaint in the United States District Court for the Northern District of Illinois, seeking review of the final agency determination. The parties consented to proceed before a United States Magistrate Judge, and, on July 23, 2009, the case was reassigned to this Court. On September 9, 2009, Mr. Eck filed a Motion for Summary Judgment; the Commissioner filed his crossmotion on November 25, 2009, and Mr. Eck filed a reply brief on December 16, 2009.

## FACTUAL HISTORY

### I.  Hearing of March 22, 2007

At the hearing on March 22, 2007, Mr. Eck was the only witness to testify (Vocational Expert Glee Ann L. Kehr was present but did not testify). Record at 594. Mr. Eck testified that he was married and had no dependent children. Tr. at 4. He testified that he completed high school and went to college for a year and a half. *Id*. He testified that he is a roofing contractor, and has spent his entire career

3

working for J. Eck & Sons, a roofing firm he owned and operated with his father. Tr. at 5, 7, 8.

Mr. Eck testified that, in addition to disability insurance benefits, he also applied for unemployment compensation in approximately 2006, though, at the time, he was still working for J. Eck & Son. Tr. at 4-5. He testified that, although his business remains open, calls have pretty much stopped coming and his business is "limping" along.

Mr. Eck testified that he has been disabled since January 1, 1999. *Id.* When questioned about why the earnings reports showed income earnings from 2001 to 2004, Mr. Eck testified that he did not stop working or being a "productive individual." Tr. at 7. He testified that from 2001 to 2004, he worked two or three hours a week, and his wife mainly ran his business. Tr. at 7. He testified that his earnings dropped off in 2004 because of his ongoing physical problems. Tr. at 8.

Mr. Eck also testified that, in late 1995 or early 1996, he hired Jim Biggerstaff to serve as his Director of Operations. Tr. at 8-9. Mr. Eck testified that Mr. Biggerstaff assumed the duties that he was no longer able to perform, such as bidding and selling jobs, doing the roofing work, and collecting payment. Tr. at 8. Mr. Eck further testified that

4

he hired Mr. Biggerstaff because he could "do gutters, [] tuck twining, [] sheet metal work, [and] carpentry work." Tr. at 9. Prior to hiring Mr. Biggerstaff, Mr. Eck testified that he would do some of the above duties, but mainly had people functioning in those areas. *Id.* Mr. Eck further stated that it was necessary to hire Mr. Biggerstaff because he needed someone to tuck twine in order to continue and complete the job of putting a roof and chimney on a home. Tr. at 10.

When questioned about when and why he stopped going on roofs, Mr. Eck testified that he stopped in about 1997, after he realized that he was a danger to himself; he testified that he stopped going up on roofs "for safety reasons." *Id.* Mr. Eck testified that, although he stopped going up on roofs, he continued to work in the business, doing the work no one else knew how to do, such as drafting language for bids and contracts. *Id.* Mr. Eck testified that he was "pretty good" at supplying the "right" word to fit the "promise of work we were going to do and [the] consideration for the money that was being paid." *Id.* Mr. Eck testified that, from about 2000 on, he worked just a few hours a week in the business, and that he stopped working entirely in 2004. Tr. at 10-11.

## II.    **Medical Evidence**

In addition to the testimony of Mr. Eck, the ALJ had before

5

her an abundance of medical records. The medical evidence in the record shows that Mr. Eck has a history of a variety of physical impairments, including Parkinson's disease, back pain, knee pain, diabetes mellitus, erectile dysfunction, hyperlipidemia, hypertension, depression, back pain, and knee pain. The records show that Mr. Eck sought treatment for his maladies at various medical facilities, predominantly for his back pain, knee pain, diabetes, and Parkinson's disease.

On September 28, 1998, Mr. Eck presented to the Mayo Clinic complaining mainly of symptoms related to his diabetes; the physician who examined him noted that his diabetes was "not in good control" and that Mr. Eck needed to get his symptoms under control. Record at 245. The physician also noted that Mr. Eck had hypogonadism, which was likely related to depression, that Mr. Eck was experiencing knee and back pain but did not want to pursue physical therapy because he was "stable in this situation." *Id.* The diagnosis noted on the records for this visit was non-insulin dependent diabetes, and the doctor noted that physical therapy would help Mr. Eck's knee and back pain. Record at 246.

On December 14, 1999, Mr. Eck was back at the Mayor clinic, where the attending physician again noted that Mr. Eck's diabetes was not well-controlled; he also noted, however that Mr. Eck's

6

"laboratory studies [were] well within normal limits." Record at
234. At that time, the records also show that Mr. Eck presented
with "bilateral spondylosis at L5 with grade II spondylolisthesis
L5 on S1 and degenerative disk disease at the lumbosacral
interspace." Record at 210.

Mr. Eck returned to the Mayo clinic on August 15, 2000; at
that time, the attending physician noted the presence of "knee
jerks" and once again highlighted that Mr. Eck's diabetes was not
being well controlled. Record at 233.

Mr. Eck returned to the Mayo clinic on January 3, 2001. At
that time, he reported having some difficulty with his vision;
specifically, he reported that his eyesight was blurry when he
was fatigued. Record at 253. On January 4, 2001, it was noted
that Mr. Eck underwent instruction on insulin administration.
Record at 228. At the same time, a chest exam revealed diabetes
and either fibrosis or atelectasis in the bases. *Id.*

Records from a May 4, 2001 visit to the Mayo Clinic, show
that Mr. Eck had significantly limited left shoulder movement at
that time, as well as moderately limited right shoulder pain
associated with pain and weakness in the lower extremity. Record
at 221. It was also noted that Mr. Eck's knee jerks were now
normal. *Id.* On July 16, 2001 and July 17, 2001, the attending
physician who examined Mr. Eck at the Mayo Clinic noted "marked

limitation on motion of both shoulders with pain." Record at
217.

In addition to his visits to the Mayo Clinic, Mr. Eck also
sought treatment closer to home. On March 27, 2001, Mr. Eck
presented to Dr. Anne Kwanik-Krawczyk at Hinsdale Family Health.
With regard to his medical history, Dr Kwanik-Krawczyk noted that
Mr. Eck had Type 2 diabetes, as well as a variety of other
ailments, including back pain as a result of a fall from a ladder
in 1988. Record at 263. Mr. Eck continued to see Dr. Kwanik-
Krawczyk regularly (roughly once or twice a month) throughout
2001, 2002 and the first quarter of 2003, though he returned to
the Mayo Clinic in the summer of 2001 as well.

In a progress note dated July 9, 2001, Dr. Kwanik-Krawczyk
noted that, based upon certain symptoms Mr. Eck was experiencing
(predominantly hand tremors), she was considering a diagnosis of
Parkinson's Disease, but thought the tremor could also be the
result of neuropathy caused by his diabetes. Record at 274.

Later that month, Dr. Kwanik-Krawczyk recommended that Mr. Eck
undergo an MRI and a neurological examination. Mr. Eck appears
to have followed those recommendations.

On August 7, 2001, Mr. Eck underwent an MRI; that scan of
his brain, taken with and without infusion contrast media,
revealed a "slight prominence of the ventricular size"; the

"cerebral cortical sulci" was also prominent.  Record at 200.  It was noted that these findings indicated the presence of "minimal cortical brain atrophy."  *Id.*

An MRI of Mr. Eck's left shoulder taken that same day "without infusion of contrast material," revealed a "partial tear or tendonitis involving the rotator cuff tendon."  Record at 201. The shoulder MRI also revealed a small joint effusion and minimal degenerative changes in the acromioclavicular joint.  *Id.*

Additionally, on September 24, 2001, Mr. Eck presented to Hinsdale Neuro Science Center, where he underwent a complete medical history and consultation with Dr. H.G. Frank.  According to the notes from that visit, Mr. Eck was referred by Dr. Krawczyk after "about a one or two-year history of insidious onset and mildly progressive difficulty with a general slowing down" and a recently-developed resting tremor in his left hand. Record at 197.  An MRI showed "very mild atrophy with some mild compensatory ventricular dilation," and "subcortical atherosclerotic changes."  *Id.*  Dr. Frank noted that Mr. Eck had "very classic masked facies," a "mild degree of cognitive blunting," "classic cogwheeling on manipulation of his upper extremities," and "resting tremor of the hands and fingers on the left with some pill-rolling qualities."  *Id.*  Dr. Frank also

9

noted that Mr. Eck's "demeanor and speech were extremely slow across the board." *Id.*

On October 16, 2001, Mr. Eck returned to the Mayo Clinic because of concerns about Parkinson's disease, left shoulder pain, and diabetes. Record at 25. The physician noted that he had not seen any changes in Mr. Eck's demeanor or walking or appearance from his previous visits. *Id.* He also noted that Mr. Eck always appeared somewhat stiff because of back pain and his facial features had always been somewhat fixed with some salivation. *Id.* Mr. Eck did not have a tremor, and in the last several years there were no changes in his condition. *Id.*

On October 17, 2001, the physician noted that an outside MRI examination of the head, dated August 7, 2001, demonstrated "mild generalized cerebral atrophy" but was otherwise negative. Record at 208. On October 22, 2001, the physician noted that an outside MRI of the left shoulder, dated August 7, 2001, was of "only moderate technical quality" but revealed some "abnormal signal within the distal supraspinatus tendon," which likely represented tendinopathy. Record at 209.

On October 18, 2001, Mr. Eck presented to the Mayo Clinic complaining of possible Parkinson's disease. Record at 23. Mr. Eck denied any real symptoms of Parkinson's disease but the physician recognized some symptoms. *Id.* Another physician

10

indicated that Mr. Eck had a "mild to moderate degree of facial hypomimia and slight hypokinetic dysarthia" and Mr. Eck presented with mild rigidity in his four limbs, alternate motion rate that was somewhat impeded at times but for which Mr. Eck compensated for, and mild bradykinesia. *Id*. The physician stated that Mr. Eck did have parkinsonism which "may well represent Parkinson's disease." *Id*.

On October 25, 2001, Mr. Eck presented to Northshore Orthopedic complaining of "multiple problems but the most significant problem is left shoulder pain." Record at 375. Bilateral shoulder impingement was noted. Record at 377.

On October 26, 2001, a physician at the Mayo Clinic noted that on specific inquiry, Mr. Eck did not have any difficulty with walking, had no rest tremor, could roll over in bed easily, and could get in and out of a car. Record at 24. He stated that the "most likely diagnosis would be idiopathic Parkinson's disease." *Id*. Further, the physician indicated that Mr. Eck was reluctant to begin taking the medication Stremiset for symptomatic treatment and Mr. Eck was given a pamphlet on Parkinson's disease, which included information on levocopa therapy that he would consider. *Id*.

Mr. Eck also saw Dr Kwanik-Krawczyk on October 26, 2001; at that time, the doctor's progress notes show that she spent a

significant amount of time talking to Mr. Eck about his
Parkinson's diagnosis. According to the progress notes, Mr. Eck
reported that he had been given several samples of anti-
Parkinson's medications, but had decided to wait to take them
until his symptoms became "more problematic." Record at 279.

At a visit on November 9, 2001, Dr. Kwanik-Krawczyk noted that
Mr. Eck was in "'denial' about his recent diagnosis of
Parkinson's" and was "electing to hold off meds until he fe[lt]
more symptomatic." Record at 281. On December 14, 2001, Dr.
Kwanik-Krawczyk indicated that Mr. Eck's rotator cuff syndrome
improved significantly and his Parkinson's disease was "stable at
present." Record at 284. On January 16, 2002, Dr. Kwanik-
Krawczyk noted that Mr. Eck had trouble getting from a sitting to
a standing position. Record at 285. At that time, she further
observed gait shuffling and slight disorientation, which improved
once Mr. Eck came into the office. Record at 286.

On February 15, 2002, Dr. Kwanik-Krawczyk indicated that Mr.
Eck's back pain was "flaring up again." Record at 289. But by
March 1, 2002, Mr. Eck had completed five sessions of physical
therapy "with positive results." Record at 361.

At a visit on May 1, 2002, Dr. Kwanic-Krawczyk indicated that
Mr. Eck had sleep dysfunction and an anxiety disorder and both
his Parkinson's disease and diabetes were stable. Record at 292.

12

On June 12, 2002, she also indicated that Mr. Eck no longer had shoulder pain and that his sleep dysfunction was greatly improved. Record at 295-96. On July 8, 2002, she further noted that Mr. Eck was generally doing well and his Parkinson's was stable. Record at 297, 298. Dr. Kwanik-Krawczyk made similar notes regarding the stability of Mr. Eck's Parkinson's on August 14, 2002, September 4, 2002 (where Dr. Kwanik-Krawczyk also indicated that Mr. Eck still had trouble walking), and October 3, 2002. Record at 300, 302, 304.

On October 22, 2002, Mr. Eck received a stress echocardiogram at Hinsdale Hospital, which revealed diabetes, hypertension, smoking history, and exertional intolerance. Record at 348.

On April 2, 2003, Dr. Kwanik-Krawczyk noted that Mr. Eck was concerned about his Parkinson's, but he was still refusing treatment. Record at 315.

On June 21, 2003, Mr. Eck's physical therapist noted that he was complaining of "left heel/ arch pain, chronic lower back pain and right shoulder stiffness and pain." Record at 521. Mr. Eck was "found to have a combination of moderate connective tissue tightness and muscle strength imbalance in his neck, shoulder, torso, pelvis, hips, calf muscles, and feet contributing to several key postural symmetries." Record at 525. It was further noted that Mr. Eck needed to have his pelvis, spine, and

shoulders rebalanced, a combination of myofascial release manual therapy, customized flexibility, strengthening, stabilization and conditioning. *Id.*

On July 18, 2003, Mr. Eck presented to Hinsdale Hospital's Department of Radiology. Record at 177. An MRI taken of Mr. Eck's lumbar spine revealed very little change in the overall appearance of the lumbar spine and a presence of "mild degenerative joint disease of the sacroiliac joint." *Id.*

On August 14, 2003, an osteoporosis scan taken of Mr. Eck revealed "osteoporosis at the AP lumbar site," and as "the bone mineral density of the lumbar spine at the L2-L4 levels [was] '3.2 standard deviations below that of a normal young adult,'" indicating that it was approximately ten times more likely for a fracture to occur at this site than in a normal adult. Record at 486. The physician also noted that the decreased bone density at this site indicated that it was approximately three times more likely for a fracture to occur at this site than in a normal adult. *Id.*

On October 6, 2003, the attending physician at Paulson Rehab Network noted that Mr. Eck had walking tolerance limited to less than 1 block, he had decreased tolerance for bending activities, and posture deviations. Record at 513. On October 9, 2003, it was further noted that Mr. Eck moved "slow" and reported 8-level

pain (out of 10, with 10 being the most severe) upon waking up. Record at 515.

On November 5, 2003, the physician at Paulson Rehab Network further noted that Mr. Eck reported that the pain was 15% better in his lower back, and that he might benefit from continuing physical therapy. Record at 511.

On November 24, 2003, the attending physician at Cornerstone Family Health, S.C. noted that Mr. Eck declined both a memory test and medication for his Parkinson's disease. Record at 435.

On December 11, 2003, the physician at Paulson also noted that Mr. Eck had shown slow progress but needed "constant cueing" to perform his exercises. Record at 510. Also on December 11, 2003, two MRIs taken of Mr. Eck's lumbosacral spine, at Hinsdale Hospital, revealed "moderately severe bilateral foraminal stenoses at the L5-S1 level secondary to a grade 1.5 spondylolisthesis." Record at 170, 484. The physician also found "bilateral pars defects with hypertrophic bone formation," "small broad-based central disc herniation at the L4-5 level," and "early degeneration of the disc material at the L3-L4 level." *Id.*

On February 3, 2004, the attending physician at Cornerstone Family Health noted that Mr. Eck's diabetes was "controlled." Record at 428.

From February 5, 2004 to March 9, 2004, Mr. Eck presented to HealthSouth complaining of severe pain (at the level of 7.5 on a scale of 1 to 10, with 10 being the highest) and seeking physical therapy. Record at 502-09. The attending clinician at HealthSouth noted that Mr. Eck would sweat profusely during his exercises and was limited from sitting for a long time. *Id.*

On February 17, 2004, Mr. Eck received a scan of three views of his left knee at Bolingbrook Mammography revealing "mild osteoarthritic change," a "probable Pellegrini-Stieda lesion near the medial femoral condyle," and that a "cystic change in the posterior aspect of the proximal tibia was probably osteoarthritic in etiology." Record at 492.

On April 12, 2004, Mr. Eck presented to Hinsdale Orthopaedic Associates, S.C. ("Hinsdale") complaining of low and mid back pain since falling off of a ladder years ago. Record at 143. The attending physician, Dr. Irene Thevatheril indicated that Mr. Eck's pain mainly occurred after he bent down, and if he sat or stood for a long period of time. *Id.* She also noted that his gait was slightly "antalgic" and shuffling, he had poor balance, a resting tremor, and slight drooling. Record at 142. She noted that Mr. Eck had Parkinson's disease, degenerative joint disease, and diabetes. *Id.*

On April 13, 2004, the attending physician at Cornerstone Family Health, S.C. noted that Mr. Eck had "joint/ back pain." Record at 422. Dr. Thevatheril indicated, on April 26, 2004, that Mr. Eck's gait continued to be "antalgic" and shuffling, he still had poor balance and resting tremor, as well as multiple spasms and tenderness. Record at 141.

On April 19, 2004, Mr. Eck presented to the Rehabilitation Institute of Chicago, affiliated with Loyola University Health Systems. Record at 160. The attending physical therapist indicated that Mr. Eck had difficulty dressing, stair climbing, lifting and carrying items. *Id.* She also indicated that Mr. Eck's "gait pattern exhibited significant deviations that may increase risks of falls." *Id.*

On April 29, 2004, Mr. Eck presented to Hinsdale Neuro Science Center. Record at 195. The attending physician noted that Mr. Eck had brandykinesia, cogwheeling, and rigidity. *Id.* Dr. Frank noted that Mr. Eck had started on Stalevo, 50 mg three times a day, but his dosage would be increased to 100 mg. *Id.* Dr. Frank further noted that the patient was extremely sedentary and he encouraged him and his wife to be more active. *Id.*

From May 17, 2004 to October 18, 2004, Mr. Eck presented to Hinsdale Orthopaedic Associates, S.C. complaining of lower back pain; cervical, thoracic and lumbar pain; resolving knee pain,

and lumbosacral pain. Record at 132-40. During this time, it was noted that Mr. Eck's gait continued to be "antalgic" and shuffling, and he retained his resting tremor. *Id.*

On June 2, 2004, Mr. Eck presented to Hinsdale Hospital's Department of Radiology complaining of worsening left knee pain caused by a fall approximately three months prior. Record at 167. An X-ray taken of Mr. Eck's left knee revealed "normal morphology, mild knee joint effusion, normal bone marrow and normal soft tissue signal. *Id.* The attending physician found that there was no evidence of internal derangement, fracture or bone contusion. *Id.*

On June 4, 2004, Mr. Eck, again complaining of worsening knee pain, had another MRI which again revealed no evidence of internal derangement, fracture or bone contusion but there was mild knee joint effusion. Record at 481.

On July 6, 2004, the attending physician noted that Mr. Eck was having cataract surgery, and that testosterone was given for his hypogonadism. Record at 414. On September 24, 2004, the attending physician noted that Mr. Eck's Parkinson's symptoms were progressively worsening. Record at 407. Finally, On October 7, 2004, the attending physician noted that Mr. Eck had a "shuffling walk" and was unable to sit on a lower chair. Record at 404.

On August 6, 2004, the physician at Hinsdale Neuro Science noted that Mr. Eck revealed that he was a boxer as a young man, and "that particular sport has a very high incidence of Parkinson's down the pike." Record at 194. He further noted that Mr. Eck could not tolerate Stalevo 100 because "of a lot of GI side effects," so he titrated the dosage back to Stalevo 50 and beyond this, he found no further change in Mr. Eck's condition. *Id.*

On September 16, 2004, Dr. Marie Kirinic wrote a letter to Blue Cross Blue Shield of Illinois stating that, following her examination of Mr. Eck on April 12, 2004, she diagnosed him with "low back pain secondary to foraminal stenosis L5-S1," "grade 1-2 spondylolisthesis with 1.5 cm slippage," "degenerative joint disease L3-S1," Parkinson's disease, diabetes, poor flexibility, and poor balance. Record at 552. On September 17, 2004, Mr. Eck wrote a follow-up letter to the Administrator of Blue Cross Blue Shield of Illinois appealing its decision to deny his physical therapy eligibility under his health care plan (ICHIP). Record at 549. Mr. Eck noted the diagnoses Dr. Kirinic made above, after his examination on April 12, 2004. *Id.* Mr. Eck also wrote that, pursuant to Dr. Kirinic's recommendation, he received physical therapy at RIC Loyola in Willowbrook, and the physical

therapy helped his gait and improved his overall functioning. *Id.*

On October 7, 2004, Dr. Irene Thevatheril noted that Mr. Eck was on a number of medications for a number of reasons. Record at 548. These medications included: Crestor for high cholesterol; Zestril for high blood pressure; Actonel for osteoporosis; Glucophage, Avandia, and insulin for diabetes; Stalevo for Parkinson's; Bextra for spinal stenosis; depotestosterone for hypogonadism; Lorazepam and Ambien for sleep disturbance; and Aspirin for heart protection. Record at 548.

On October 13, 2004, Mr. Eck completed an "Activities of Daily Living Questionnaire for Physical Impairments," a form distributed by the Bureau of Disability Determination Services. Record at 99. On that form, Mr. Eck reported that his wife had to cut his food for him, that he had trouble turning the pages of newspapers, that he had a slight problem dialing the phone, that he could use a pen or pencil, but that his hand shook when he did so, that his wife had to wash his hair, and that he needed help dressing and tying his shoes at times. *Id.* Mr. Eck further reported that he could not carry groceries and could not straighten his arm all the way; he reported that, although he was able to reach up, doing so caused his arm to shake. *Id.* Mr. Eck reported that he had great difficulty getting in and out of a

car, getting up from a chair or sofa, getting out of bed, and getting out of the tub.  Record at 100.

In terms of assistance, Mr. Eck wrote that he needed help walking, standing, and sometimes balancing, and that he often used supports, e.g., holding on to another person or a piece of furniture or using a cane, a walker or a wheelchair.  *Id.*  Mr. Eck further reported that he was unable to sit for even two hours straight because his back would begin to hurt and he had to walk around a little.  *Id.*  In addition, Mr. Eck wrote that his wife had to do all of the cooking and shopping, he did not perform any cleaning duties, and he stayed in bed most of the day.  *Id.* Finally, Mr. Eck wrote that he could no longer do any activities "except to go to an occasional movie or shop for a little while where a store has a wheelchair available," and he only did these activities with his wife.  *Id.*

On October 14, 2004, the treating physician at Hinsdale Orthopaedic noted that Mr. Eck had ongoing tenderness and spasms in the "gluteal and thoracolumbar area."  Record at 132-33.

On November 3, 2004, Mr. Eck presented to Holland Chiropractic and Rehab Center complaining of "intermittent daily mild to low back pain and neck pain."  Record at 182.  The attending physicians indicated that Mr. Eck had a slow shuffled gait and resting tremors, as well as tenderness in the cervical,

thoracic, and lumbar region. *Id.* They also noted that evaluation of X-rays, dated February 20, 2004, revealed a "Grade II sponylolisthesis at L5 on S1, degenerative disc disease at the lumbosacral interspace, and degenerative changes in the cervical spine, especially at C5-C6." *Id.*

On December 21, 2004, Mr. Eck saw Dr. Seema Gupta, a consultative physician for the State of Illinois Bureau of Disability Determination Services; at that time, he was suffering from symptoms relating to Parkinson's disease, diabetes, degenerative joint disease, and osteoporosis. Record at 189. Dr. Gupta noted that Mr. Eck had rigidity of muscles, a resting tremor, and an abnormal gait in that he could not walk more than 50 feet without a cane. Record at 190.

## II. Work Activity Report

In a Work Activity Report signed by Mr. Eck on September 7, 2004, Mr. Eck indicated that he earned more than $200 in every month since January 1, 1999, his alleged disability onset date, but that he had worked less than 40 hours in each of those months. Record at 110. Mr. Eck indicated that, at that time, he was not using any assistive devices, but was unable to "go out and directly supervise the jobs my employees are performing." Record at 111. Mr. Eck stated that his work activity included selling and working on roofs, giving estimates, and collecting

money for jobs. Record at 110. Mr. Eck also wrote that he had to hire another person to assist with his job duties and that he was only able to work one or two hours per week. *Id.* He further wrote that he had to rest his back by lying down as much as possible because he was "in so much pain." *Id.* Mr. Eck also reported that "due to the Parkinson's disease, he lo[]ses his balance, therefore he cannot get on roofs and give estimates nor take measurements." Record at 113. The SSA representative who interviewed Mr. Eck noted that Mr. Eck had been working just one or two hours per week, and that the earnings on Mr. Eck's record "should all be going to his wife who pretty much took over the business." *Id.* Based upon the intake information, the SSA representative recommended a disability onset date of January 1, 1999. *Id.*

## SUMMARY OF ALJ'S DECISION

The ALJ determined that Mr. Eck was entitled to benefits as of February 11, 2004. Record at 13. In making this determination, the ALJ relied first and foremost on Mr. Eck's earnings record, which showed consistent earnings through 2004 and then a drop off in that year. Record at 14. The ALJ acknowledged that Mr. Eck had hired an employee in 1995 or 1996 to help him with the work he was no longer able to do. But the ALJ determined that the hiring of the additional employee was not

*prima facie* evidence that Mr. Eck was disabled because, although Mr. Eck testified that he required assistive devices and could no longer go out on roofs at that time, it did not mean that he could not work. *Id.* Indeed, the earnings record showed that he had continued to operate his business and that he continued to provide productive services, even if he could no longer perform many of the tasks he previously performed. Also significant was Mr. Eck's testimony: he testified that he did "bits and pieces" of work and that he worked on contracts. *Id.* He also testified that the significant drop in his earnings in 2004 was caused by the worsening of his Parkinson's symptoms, which was consistent with the medical evidence before the ALJ. *Id.* The ALJ determined that Mr. Eck had not engaged in substantial gainful activity since February 11, 2004; she determined that he was able to work (and that he did work), and was therefore not disabled prior to that date. Id.

## STANDARD OF REVIEW

An ALJ's decision should be affirmed by the reviewing district court if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171 1176 (7th Cir.

24

2001). The Court cannot substitute its own judgment for that of the ALJ by reevaluating the facts or reweighing the evidence to determine if the claimant is in fact disabled. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). Should there be conflicting evidence that would permit reasonable minds to differ, it is the responsibility of the ALJ, not the courts, to determine if the claimant is disabled. *Herr v. Sullivan*, 912 F.2d 178 (7th Cir. 1990).

The ALJ is not required to address all the evidence in the record, but she must articulate her analysis in a manner that permits understanding of how the evidence supports her conclusion, so that the Court may conduct a meaningful review of the SSA's ultimate findings on behalf of the claimant. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). If the ALJ fails to rationally articulate the grounds for her decision in a manner that permits meaningful review, the Court must remand. *Id.* "Thus, the issue before this Court is not whether [the claimant] is disabled, but rather, whether the ALJ's findings were supported by substantial evidence." *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

## DISCUSSION

In his motion for summary judgment, Mr. Eck argues that the SSA's determination concerning the onset date of his disability

was erroneous, that the SSA's date was well after the actual onset of his disability, that he became disabled on January 1, 1999, yet the ALJ determined that he did not become disabled until February 11, 2004. He also argues that the ALJ ignored the evidence supporting an earlier onset date. Mr. Eck argues, more specifically, that the SSA failed to apply governing regulations, i.e. SSR 83-20, in considering the issue of onset date and ignored evidence that Mr. Eck's disability began well before the established onset date. Mr. Eck argues that the SSA, ALJ, and Appeals Council improperly relied on the February 11, 2004 entry written by the neurologist as the determination of the onset of the disability. Mr. Eck argues that the ALJ made false assumptions in that she improperly relied on Mr. Eck's increase in earnings in 1999, with a drop-off in 2004, as evidence that he was engaging in substantial gainful activity until 2004. Record at 5.

Further, Mr. Eck argues that the ALJ improperly read, and relied on, the medical evidence. Record at 6. He argues that the ALJ relied on a September 24, 2001 report by his neurologist to support her conclusion, and used the neurologist's note that Mr. Eck had "marked brandykinesia," "classic cogwheeling," and resting tremors to support her finding that the claimant met 11.06 of the Listing of Impairments in 2004. *Id.* Mr. Eck also

argues that it is the date of the onset of the disability, not the date of diagnosis, that controls disability of determinations of disability.  *Id.*  He argues that the ALJ did not employ the analysis outlined in SSR 83-20 to determine his disability onset date, but instead "picked and chose among the medical records to support the disability determination already reached."  *Id.* Finally, Mr. Eck argues that the ALJ erred by dismissing the vocational expert ("VE") before she was able to testify at the hearing held on March 22, 2007.  *Id.*

In response to Mr. Eck's arguments, the Commissioner argues that the ALJ's onset date determination was well supported by substantial evidence in the record.  The Commissioner notes that, to qualify for disability benefits, a claimant must be able to show that he has not engaged in substantial gainful activity. The Commissioner argues that Mr. Eck failed to meet his burden of demonstrating that he had not engaged in substantial gainful activity and the ALJ properly found the onset date of Mr. Eck's disability to be when Eck stopped working.

In determining the correctness of the onset date of disability, "the issue is whether there is substantial evidence in the record to support the date chosen by [the ALJ], not whether an earlier date could have been supported."  *Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 512 (7th Cir. 1999).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stein v. Sullivan*, 892 F.2d 43 (7th Cir. 1989) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)). Further, when a claimant is found to be disabled, and the ALJ is called upon to determine whether the disability arose at an earlier date, the ALJ must "apply the analytical framework outlined in SSR 83-20 to determine the onset date of disability." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 349 (7th Cir. 2005). When the disability is of nontraumatic origin, as is the case here, the factors to be considered are: (1) the claimant's statements regarding when the disability began (which can be found on the disability application and the disability report); (2) the day the impairment caused the individual to stop work; and (3) "medical reports containing descriptions of examinations or treatment of the individual." SSR 83-20.

The ALJ determined that Mr. Eck became disabled on February 11, 2004 because that was the date he stopped engaging in substantial gainful activity. According to the ALJ, this conclusion was supported by Mr. Eck's earnings record from 1999 to 2004, which showed a steady increase in earnings up to that date, and then a precipitous decline after that date. Record at 11. The ALJ also relied upon a statement from Mr. Eck's

neurologist, who indicated that, as of September 24, 2001, Mr. Eck owned and operated his own roofing company. Record at 14. Also significant to the ALJ was the fact that, after the September 24, 2001 report, Mr. Eck did not see his neurologist again until February 11, 2004; at that time, the neurologist noted that Mr. Eck demonstrated "'rather marked brandykinesia and cogwheeling' with resting tremors." *Id.* This supported the determination that Mr. Eck's onset disability date was February 11, 2004. *Id.*

The ALJ relied on Mr. Eck's testimony that he hired an employee ten years prior to the hearing on March 22, 2007. Record at 14. But the ALJ determined that the hiring of an employee was not "prima facie evidence of disability." *Id.* The ALJ also noted that Mr. Eck admitted in the hearing that the new employee went on roofing jobs while Mr. Eck worked on "wording" the contracts. *Id.* The ALJ further relied on Mr. Eck's earnings record, which showed a significant increase in earnings in 1999, which was after the new employee was already on board. *Id.* Mr. Eck testified that the increase in earnings in 1999 simply reflected fluctuations in the market and their effect on his business; he also argued that his sister bought him assistive devices, which allowed him to be more productive. *Id.* Yet the ALJ determined that this evidence did not establish that Mr. Eck

could not operate his business, or that he did not work for the earnings listed from 1999, even if he did not go out on roofing jobs. *Id.* Finally the ALJ was persuaded by Mr. Eck's own words: when asked why his earnings dropped in 2004, he stated that this was when his Parkinson's became worse. This was consistent with the medical records. *Id.*

In her determination, the ALJ properly followed the steps outlined in SSR 83-20 in determining the onset disability date. At step one of the sequential analysis outlined above in SSR 83-20, the ALJ must first look to the disability application and on the disability report, as the "date alleged by the applicant as '[t]he starting point' in determining the onset date. *Lichter v. Bowen*, 814 F.2d 430 (7th Cir. 1987); *see also* SSR 83-20. Mr. Eck wrote on an "Activities of Daily Living Questionnaire for Physical Impairments," distributed by the Bureau of Disability Determination Services on October 13, 2004, that he could no longer do any activities "except to go to an occasional movie or shop for a little while where a store has a wheelchair available." Record at 100. On his work activity report, Mr. Eck indicated that the onset date of his disability was January 1, 1999. Record at 110. Yet, even if that statement is relevant under step 1, it is not determinative; that statement is the starting point, not necessarily the ending point of the analysis.

The ALJ relied heavily on Mr. Eck's earnings record, which undermine that statement considerably. Certainly, the fact that he was working, is strong evidence that he could work.

Mr. Eck testified at the hearing that for at least some time prior to that year, his work was affected by the onset of his disability. Record at 592-602. He also testified that, from 2001 through 2004, he only worked two to three hours per week and that his wife was mainly running his business. Tr. at 7. Mr. Eck further testified that he hired Jim Biggerstaff in late 1995 or 1996 to take over the duties he previously performed because he realized that he was a danger to himself. Tr. at 10. Mr. Eck finally testified that he no longer performed any duties for his company, J. Eck & Sons. Tr. at 11. To be sure, his impairments affected him prior to the onset date and prevented him from doing certain work related tasks. But there is no evidence that the work Mr. Eck performed in 1999, 2000, 2001, 2002, 2003 and the beginning of 2004 was not substantial gainful activity. *See infra*. The earnings record is strong evidence that what he was doing in those years was, indeed, substantial gainful activity.

At step two of the sequential analysis above, the ALJ must look to such evidence as the work activity report to ascertain what kind of work activity the claimant performed before and after the alleged onset date. SSR 83-20; *Henderson*, 179 F.3d at

512-13. On his activity work report Mr. Eck wrote under his "present work activities" that he had to hire another person and he was only able to work 1-2 hours per week. Record at 110. He further wrote that he had to rest his back by lying down as much as possible. *Id.* Mr. Eck further wrote that he was unable to go out and directly supervise the jobs. Record at 111. The representative noted that the earnings on Mr. Eck's record "should all be going to his wife who pretty much took over the business," and the recommended onset disability date was January 1, 1999. Record at 113.

However, both the Commissioner and the ALJ, in their analysis of Mr. Eck's earnings record, properly construed Mr. Eck's rise in earnings from 2001 through 2004 as evidence of substantial gainful activity. Substantial work activity is defined as work activity that "involves doing significant physical or mental activities" and it may be substantial even if the claimant works part-time, gets paid less, or has less responsibility. 20 CFR § 404.1572. Gainful activity is defined as the work usually done by the claimant for pay or profit, even if that profit is not realized. *Id.* Although Mr. Eck testified that he worked only 2-3 hours per week, this work was of the type that he would do in the normal course of his business. As Mr. Eck himself testified, he did the work that no one else in his

company knew how to do, and this included drafting contract language for jobs and bids, a necessary function for a roofing business. Tr. at 10. In short, the work Mr. Eck performed involved significant mental activities necessary for the running of his business, and thus was "substantial" as defined above.

Furthermore, on the DIB Review Sheet, Mr. Eck's earnings were recorded as follows: in 2001, he earned $15,000; in 2002, he earned $18,000; in 2003, he earned $19,000; in 2004, he earned $9,500; and in 2005, he earned $0. Thus, as the Commissioner correctly determined, Mr. Eck's earnings records support the conclusion that substantial gainful activity ceased in 2004. The ALJ correctly determined that the increase in earnings reflected increased productivity from Mr. Biggerstaff, who was hired by Mr. Eck in late 1995 or 1996. And the ALJ also determined that Mr. Eck made the least amount of money in 2004, less than he made in any of the years prior. The "near-total collapse" of Mr. Eck's business happened in 2004, suggesting that Mr. Eck's contributions were, in fact, central to the business; that the collapse of the business occurred at the same time his health was deteriorating is further evidence that he became disabled – not diagnosed, but disabled, as that term is defined in the Social Security Act – in 2004. The ALJ properly concluded that Mr.

Eck's work activity prior to 2004, with a drop off in 2004, supports an onset disability date in 2004.

Finally, in the third step of the analysis mentioned above, the ALJ must look to medical and other evidence. SSR 83-20. The medical evidence is the "primary element in the onset determination." SSR 83-20; *Lichter*, 814 F.2d at 434. SSR 83-20 recognizes that for slowly progressive impairments, sometimes it is impossible to determine the exact date that the impairment became disabling. SSR 83-20. Further, "it is not necessary for an impairment to have reached listing severity... before onset can be established." *Id.* When precise evidence is not available and there is a need for inferences, there must be "informed judgment of the facts" and this judgment must have a "legitimate medical basis." *Id.* This legitimate medical basis should come at the hearing, where an ALJ is to call upon a medical advisor and also carefully assess the medical evidence provided in the file. *Id.*

The ALJ relied on some of the medical evidence in her analysis and relied on a note written by Mr. Eck's neurologist stating that Mr. Eck demonstrated "'rather marked brandykinesia and cogwheeling' with resting tremors." Record at 14. In addition, the Commissioner argues that other medical evidence, including a doctor's note in January 2001 stating that Mr. Eck

was "reasonably well balanced psychologically in his life and work," record at 229, and a note by Dr. Tisch of the Mayo Clinic that despite some stress with his job, Mr. Eck was doing "well," supports the inference that Mr. Eck was able to continue work through 2001 and beyond.

Significantly, the records show that, long after the date on which he alleges his disability began, Mr. Eck consistently declined physical therapy and declined medication for his Parkinson's, stating that he wanted to hold off until his symptoms became more problematic or serious. Record at 315. This supports the inference that Mr. Eck found the work distracting and was, as he described it, "a chaos of unending distractions." Record at 385.

Mr. Eck did see a lot of doctors. Besides a Parkinson's diagnosis and complaints about knee and back pain, in 2002, Dr, Kwanik-Krawczyk noted that his Parkinson's was stable, record at 297, 298, and even in 2004, MRIs did not reveal any internal derangement in his knee, but only mild knee joint effusion. Record at 481. In 2004, a physician indicated that Mr. Eck's "gait pattern exhibited significant deviations that may increase risks of falls." Record at 160. Also in 2004, Dr. Kirinic noted that Mr. Eck had Parkinson's disease, poor flexibility, and poor balance. Record at 552. The medical evidence dating prior to

this, does not indicate that Mr. Eck was unable to work. Dr. Kim, an Agency physician, suggested an onset date of February 2004 based upon prior clinical findings that were unremarkable; this further supports the ALJ's determination.

## CONCLUSION

For the reasons explained above, the Court finds that the ALJ's decision concerning the onset date of Mr. Eck's disability was supported by substantial evidence. In determining Mr. Eck's disability onset date, the ALJ appropriately considered and weighed the medical evidence, as well as Mr. Eck's testimony and the evidence of his work activity and earnings. In short, the ALJ built an accurate and logical bridge between the record and her conclusion that the appropriate onset disability date was February 11, 2004. Accordingly, the Court affirms the decision of the Commissioner. The Commissioner's motion for summary judgment is granted, and Mr. Eck's motion for summary judgment is denied.

Dated: May 12, 2010

ENTER:

ARLANDER KEYS
United States Magistrate Judge